IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| RICHARD MAYBANK, | ) | CIVIL ACTION No. 4:08-643-MBS-TER |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied.

## I. PROCEDURAL HISTORY

Plaintiff, Richard Maybank, filed applications for DIB and SSI alleging disability since September 5, 2005, claiming disability due to seizure disorder, mental impairment, neck and back pain, hypertension, hyperglycemia, and depression. (Tr. 40). Plaintiff requested a hearing after his claims were denied initially and upon reconsideration. A hearing was held on September 17, 2007. The Administrative Law Judge (ALJ) issued a decision on November 16, 2007, finding that Plaintiff was not disabled because he could perform a full range of unskilled work, including past relevant work as a stacker. (Tr. 117-18). As the Appeals Council denied Plaintiff's subsequent request for

review of the ALJ's decision, the ALJ's decision became the Commissioner's final decision for purposes of judicial review under 42 U.S.C. § 405(g).  *See* 20 C.F.R. §§ 404.981, 416.1481.

## II.  FACTUAL BACKGROUND

Plaintiff was born on April 4, 1958, and was 49 years old on the date of the administrative hearing before the ALJ. (Tr. 66).  Plaintiff testified that he had a tenth grade education. (Tr. 351). Plaintiff has past work experience as a truck driver and a stacker.

## III.  DISABILITY ANALYSIS

Plaintiff's points on appeal consist of the following, quoted verbatim:

1.  The ALJ's determination that the Plaintiff did not meet listing 12.05 (c) is based on legal error and is not supported by substantial evidence.

2.  The ALJ did not consider all of the Plaintiff's severe impairments.

3.  The ALJ failed to properly evaluate the credibility of the Plaintiff.

(Plaintiff's brief).

In the decision of November 16, 2007, the ALJ found  the following:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.  The claimant has not engaged in substantial gainful activity since September 5, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: seizure disorder and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920 (c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is limited to simple 1-2 step tasks, dealing with things rather than people, and he should have only occasional conversation and interpersonal interaction with other employees. He should never climb ladders, scaffolds, or ropes, and he should never be exposed to hazards due to his allegations of seizures.

6.  The claimant is capable of performing past relevant work as a stacker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in Social Security Act, from September 5, 2005 through the date of this decision (20 CFR § 404.1520(f) and 416.920(f)).

(Tr. 10-18).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that the phrase "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 390-401 (1971). Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial evidence and (2) whether the legal conclusions of the Commissioner are correct under controlling law. *Myers v. Califano*, 611 F.2d 980, 982-83 (4th Cir. 1988); *Richardson v. Califano*, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390. Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. *Shively v. Heckler*, 739 F.2d 987,

989 (4th Cir. 1984). The Court's scope of review is specific and narrow. It does not conduct a *de novo* review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405 (g) (1982); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established. Five questions are to be asked sequentially during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a (1988). An ALJ must consider (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 20 C.F.R. § 404.1505(a); *Blalock*, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981). An ALJ's factual determinations must be upheld if supported by substantial evidence and proper legal standards were applied. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if he can return to his past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62. The claimant bears the burden of establishing her inability to work within the meaning of the Social Security Act. 42 U.S.C. § 423 (d)(5). He must make a *prima facie* showing of disability by showing she was unable to return to her past relevant work. *Grant v. Schweiker*, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id*. at 191.

## IV.  MEDICAL REPORTS

The undersigned has reviewed the medical records and finds many of the reports relevant to the issues in this case. As Plaintiff has not seriously disputed the medical evidence as set out by Defendant in his brief, the medicals will be set forth herein from Defendant's brief.

**Mental Impairment Reports:**

Douglas Ritz, Ph.D., conducted a psychological evaluation in January 2006 (Tr. 144-47). Plaintiff told Dr. Ritz that he had dropped out of school in the 11th grade (Tr. 144). He complained of depression, but did not say why he was depressed (Tr. 144). He denied having received mental health treatment (Tr. 144). He said he had been a heavy drinker until he started having seizures (Tr. 144). He claimed that he began having seizures four or five years before the evaluation (Tr. 144).

He said he last had a seizure three months before the evaluation, when he had six of them (Tr. 144). He said had he had been terminated from work because of sick leave (Tr. 144). He has been married twice (Tr. 144). Plaintiff said he cooked, cleaned the yard, swept the floor, exercised, walked, and took care of his personal grooming (Tr. 145). He said he went to church and was able to pay his bills (Tr. 145).

Testing revealed IQ scores of 68 to 72 and memory skills at or above cognitive functioning levels (Tr. 145). Academically, Plaintiff read at the second grade level, spelled at the third grade level, and was able to perform at the third grade level in arithmetic (Tr. 146). Dr. Ritz noted that Plaintiff's skills and memory were in the borderline and low-average range (Tr. 146). He thought Plaintiff could perform unskilled work and was able to understand the spoken word (Tr. 146). He was able to do simple reading and calculations, follow simple directions, and avoid physical danger (Tr. 146). He was able to concentrate and persist sufficiently to perform simple work (Tr. 146). Dr. Ritz's assessment was history of alcohol abuse, dysthymic disorder, and borderline intellectual functioning (Tr. 147). He also determined that "there would seem to be no reason why Mr. Maybank could not participate in some type of unskilled job such as what he was doing" (Tr. 146).

The next month, a State agency psychologist, M. Patrick Jarrell, Ph.D., reviewed Plaintiff's medical records and completed a Psychiatric Review Technique form (Tr. 192-209). Dr. Jarrell noted that Plaintiff had an organic mental disorder (borderline intellectual functioning), an affective disorder (dysthymia and depression, without significant limitations), and a substance abuse disorder. These disorders caused mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration (Tr. 192-95, 200. 202). Dr. Jarrell

noted that the evidence did not establish the presence of the "C" criteria of any section of 12.00 of the Listings (Tr. 203). Dr. Jarrell also completed a Mental Residual Functional Capacity form (Tr. 206-09). He noted that Plaintiff was not significantly limited in most areas and was moderately limited in his ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, and interact appropriately with the general public (Tr. 206-07). He noted that Plaintiff would be able to understand simple instructions and perform simple tasks without special supervision and would function best in work settings that did not require interactions with the general public or a large number of co-workers (Tr. 208). Dr. Jarrell did not question the validity of the I.Q. scores that were obtained following Plaintiff's testing by Dr. Ritz. (*Id.*).

**b. Physical Impairments**

In November 2004, Plaintiff reported to Diana Hayslip, M.D, for treatment of seizures (Tr.173). She indicated that the seizures were controlled and stable, and relieved by medication (Tr. 173). She prescribed Dilantin, a seizure medication (Tr. 174). In a letter to the Department of Motor Vehicles, Dr. Hayslip wrote that Plaintiff was on seizure medication and had not had a seizure in the past 18 months (Tr. 175). Plaintiff returned to Dr. Hayslip in February 2005 (Tr. 171). She noted that Plaintiff had not had a seizure in the past 18 months (Tr. 171). Plaintiff reported to the emergency room for treatment of seizures in September 2005 (Tr. 148-162 ). A CT examination of the brain done in September 2005 was normal (Tr. 152). Also in September 2005, the physicians noted alcohol use (Tr. 149). At that time Plaintiff reported that he had seizures since he fell off a scaffold in 1995, but only had three seizures since then (Tr. 156).

A week later, Plaintiff reported to Dr. Hayslip (Tr. 169). His blood pressure was high (Tr. 169). She noted that Plaintiff admitted to significant alcohol abuse and advised him that he should decrease alcohol use, as it could decrease the effectiveness of medication (Tr. 170). A laboratory note in September 2005 noted that Plaintiff's anti-seizure medication level was in the appropriate range and that his seizures were likely secondary to the decrease in the medication by alcohol, "he must stop drinking or he will have more seizures" (Tr. 190). A week later, Plaintiff complained of depression, caused by separation from his children and relieved by alcohol (Tr. 167). Plaintiff also complained of a headache and had elevated blood pressure (Tr. 167). Examination was normal (Tr. 167-68). Dr. Hayslip prescribed medication for hypertension and anti-seizure medication (Tr. 168). A month later, Dr. Hayslip noted that Plaintiff's hypertension was relieved with medication (Tr. 165). She also noted that Plaintiff complained of mild back and neck pain, which he said had begun months before (Tr. 165). Examination was normal (Tr. 165). Dr. Hayslip's assessment included a new diagnosis of cervical strain, but was otherwise normal (Tr. 166). The next month, Dr. Hayslip noted only hypertension and seizures (Tr. 163). She also assessed hyperglycemia (Tr. 164). Laboratory results show that Plaintiff's phenytoin level was untraceable in November 2004, undetectable in February 2005, 1.4 in September 2005, 5.3 in October 2005, 14.4 in November 2005, 12.5 in December 2005, 1.9 in April 2006, 4.9 in July 2006, 7.8 in August 2006, 7.2 in February, 2007, 12.8 in March 2007, 11.7 in August 2007 (Tr. 134, 161, 171, 178. 181, 185-86, 256-58, 265, 273-74, 276). According to the laboratory results, the optimal therapeutic range for this medication (Dilantin or Phenytoin) was 10 to 20 (Tr. 134). In December 2005, his hemoglobin A1C (measuring blood sugars) was 5.6, which was normal (Tr. 259). His hemoglobin A1C levels were slightly high

in February 2007 (Tr. 277). In January 2006, Plaintiff returned to Dr. Hayslip (Tr. 248). Dr. Hayslip diagnosed noninsulin dependent diabetes (also known as Type II diabetes) and hypertension (Tr. 248). Both were relieved by medication (Tr. 248). Plaintiff reported to the emergency room for treatment of seizures in April 2006 (Tr. 125-36). The seizure was attributed to medical non-compliance (Tr. 129). Plaintiff then returned to Dr. Hayslip (Tr. 250). Examination was normal (Tr. 250-51). Four months later, Plaintiff returned to Dr. Hayslip with blood in his stool and seizures and for follow-up care for diabetes and hypertension (Tr. 252). She noted that the seizures were aggravated by alcohol and relieved by Dilantin (Tr. 252). Examination was normal (Tr. 253).

A State agency physician, Charles Fetts, reviewed Plaintiff's medical records and assessed his residual functional capacity (Tr. 210-17). Dr. Fetts indicated that Plaintiff had no exertional limitations, no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations except to avoid hazards as a seizure precaution (Tr. 211-14). He opined that Plaintiff's seizures were probably related to alcoholism and noted that Plaintiff's Dilantin level was sub-therapeutic (Tr. 211). Plaintiff reported to the emergency room for treatment of a seizure in February 2007 (Tr. 292-302). It was noted that he had poor compliance with his medication (Tr. 292, 295). His Dilantin level was 2.5 (Tr. 305). A cervical spine x-ray was normal (Tr. 306). Plaintiff then reported to the Franklin C. Fetter Cross Family Health Center (Family Health) complaining of headaches (Tr. 288). His treatment provider noted that he had hypertension and recommended a change of medication regimen (Tr. 288). He returned two weeks later, complaining of intermittent headaches (Tr. 287). He continued to receive treatments for headaches and pain in the back of the neck (*see, e.g.*, Tr. 284).

In July 2007 Plaintiff reported to the emergency room for treatment of seizures (Tr. 221-25, 228-42). He was admitted and put in restraints for four hours, apparently because his family refused to sit with him (Tr. 222, 235). Plaintiff's glucose levels were high (Tr. 223). His phenytoin (Dilantin) level was 0.5, well below therapeutic range (Tr. 238). An emergency room note reflects: "non-compliant w/meds" (Tr. 233). A head CT scan revealed some soft tissue swelling and sinus disease (Tr. 239). A CT scan of the cervical spine revealed slight curvature reversal and mild multilevel degenerative change (Tr. 241-42).

## C. Hearing Testimony

### 1. Testimony of Plaintiff and Plaintiff's Sister

Plaintiff testified that he was 48 years old (later corrected to 49 upon questioning by his counsel, Tr. 355) and had a tenth-grade education and that he did not go to any technical or vocational schools (Tr. 351). He said he could read, write, add, and subtract (Tr. 351), but he also testified he could not read that well, but he could read "a little bit." (Tr. 360). He said that his sister had to help him read any mail that he received (*Id.*). He also testified that he left school after the tenth grade because "I couldn't keep up with the rest,"and that he failed two or three grades in school, but he could not remember exactly how many times he failed a grade. ( *Id.*).

Plaintiff said he last worked on September 3, 2005, as a stacker (Tr. 352, 354, 368). He said that he had a seizure on that day and did not call into work and, as a result, he was fired (Tr. 355). He said he did not remember filing a worker's compensation claim, but that he did collect some money after he stopped working (Tr. 352). He said he did not receive unemployment benefits (Tr. 353-55). He then said he did receive an unemployment check (Tr. 356).

Plaintiff said that he had an increase of seizures since 2004 (Tr. 358). However, he said he did not have problems with seizures at work, although he thought no one would hire him because he had seizures (Tr. 358). Plaintiff also reported that he had memory problems (Tr. 358). Plaintiff said that he napped most of the day, but could not sleep at night (Tr. 358-59). He said he had regular headaches (Tr. 360). Plaintiff said he was taking medication for seizures, as prescribed, but it was not working (Tr. 360-61). He denied using alcohol since he began having seizures (Tr. 369). He also complained of cervical back pain, which limited his ability to turn his head at times (Tr. 362).

Plaintiff claimed he could not lift heavy objects due to back pain (Tr. 363). He said he could not stand more than ten minutes at one time due to dizziness (Tr. 363). Plaintiff said he could not cook at the time of the hearing, but that he had cooked some before (Tr. 363-64). He said that he did not have a driver's license, due to the seizures (Tr. 365). He said that he had passed the driver's licence test through an oral examination (Tr. 365-66). He said that, when he had money, he paid his bills (Tr. 366). He said that the only bill he had was from a loan company and that his sister had to remind him when and where to pay the bill. (Tr. 367). He said that he did not: do dishes; do laundry; fold clothes; iron; sweep; mop; vacuum; take out the trash; dust; clean the bathroom, kitchen, or living room; do maintenance around the house; do yard work; rake; garden; cut grass; pick up outside; hunt; fish; sew; crochet; go to the store; have hobbies; go out to eat; go to movies; go to parks, beaches, or lakes; or exercise (Tr. 370-71). He said that he went to church twice a month (Tr. 371).

Plaintiff's sister also testified at the hearing (Tr. 373). She said that her brother had six seizures over the past year (Tr. 373). She said that he complained of headaches after his seizures (Tr. 374). She also said that she reminded him to take his medication and to go to appointments

(Tr. 374-75). She said that her brother sat most of the day (Tr. 375). She said that he took out the trash, swept, and straightened up a chair (Tr. 377). She thought he could not work due to headaches and dizziness (Tr. 375). Plaintiff did not introduce any of his school records and, other than the discussion about his failing grades and dropping out of school, neither the ALJ nor Plaintiff's attorney specifically questioned Plaintiff about how his life was before he turned twenty-two years old.

## 2. Vocational Expert Testimony

The ALJ also took the testimony of Feryal Jubran, a vocational expert who had an opportunity to review the record and had been present during the course of the hearing (Tr. 382-83). Ms. Jubran testified that Plaintiff's past work was as a stacker (DOT 691.687-010) (unskilled, medium) and as a trucker (DOT 906-683-022) (semi-skilled, medium) (Tr. 383). She said that the trucker job required a commercial driver's license (Tr. 383-84). The ALJ asked Ms. Jubran to consider a person the same age as Plaintiff with the same educational background and work experience; who had no exertional limitations; was unable to climb ropes, ladders, or scaffolds or work around hazards; could do simple one- or two-step tasks; would need to deal with things, rather than people; and could be around employees occasionally (Tr. 383). Ms. Jubran testified that the person could perform the stacker job (Tr. 384).

## V. PLAINTIFF'S SPECIFIC ARGUMENTS

## 1. Listing 12.05C

Plaintiff argues that the ALJ erred in his decision by finding that Plaintiff did not prove that his mental impairment meets the Listing for mental retardation. He claims that the ALJ committed legal error when he found that Plaintiff's evidence showed only borderline intellectual functioning

and not mental retardation under Listing 12.05C. Specifically, Plaintiff contends that the ALJ was required to accept the low scores on the psychological testing performed by Dr. Ritz because the finding that the scores achieved are not "a valid indicator of [Plaintiff's] life-long abilities" is not supported by substantial evidence, and to then *presume* that achieving those low test scores as an adult meant that Plaintiff also had the requisite "subaverage general intellectual functioning . . . during the developmental period [before age 22]" to satisfy the preliminary definition of Listing 12.05(c). Alternatively, Plaintiff claims that the ALJ's finding that there is "no real evidence" or "no evidence" showing that Plaintiff had deficits in adaptive functioning during the developmental period is not supported by substantial evidence because there is, in fact, some record evidence that would support a finding of such deficits during the subject period. Finally, building on his previous lack of substantial evidence arguments, Plaintiff then claims that because the ALJ found that he had the additional "severe impairment" of seizure disorder along with his low intellectual functioning, the judge committed legal error in finding that Plaintiff's mental condition does not meeting Listing 12.05C.

## 2. __Consideration of all severe impairments__:

Under this argument, Plaintiff contends that the ALJ's findings that his neck and back pain and his diabetes mellitus were not "severe" impairments failed to give proper weight to objective medical findings and resulting medication prescriptions supporting the serious nature of those impairments.

## 3. __Credibility of Plaintiff as to the extent of his limitations__:

Under this argument, Plaintiff contends that the ALJ's reliance on "inconsistencies" between Plaintiff's trial testimony about his limitations and the statements he was reported to have made to

the testing psychologist, Dr. Ritz, to support his finding that Plaintiff lacked credibility was unreasonable given the one and one-half year period between his meetings with Dr. Ritz and the date of the hearing before the ALJ.

## VI. ANALYSIS

**Sufficiency of the evidence respecting Listing 12.05C**

The applicable law is clear that the claimant bears the burden of demonstrating that his impairments meet or equal a listed impairment. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hall v. Harris,* 658 F.2d 260, 264 (4th Cir.1981). Listing 12.05 sets forth a two-part inquiry for determining mental retardation. *Norris v. Astrue,* No. 7:07- CV-184-FL, 2008 WL 4911794, at *3 (E.D.N.C. Nov. 14, 2008); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. I § 12.05. First, a claimant must satisfy the diagnostic description of mental retardation ("capsule definition"), which requires a showing of "(1) significantly subaverage general intellectual functioning[1] (2) with deficits in adaptive functioning[2] (3) initially manifested during the developmental period: i.e .... before age 22." *Id.* (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05). Upon making this showing, the claimant

---

[1] The phrase "significantly subaverage general intellectual functioning" is also found in the definition of mental retardation found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-1V"), which the DSM-IV defines as "an IQ of about 70 or below." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 39 (4th ed.1994).

[2] Listing 12.05 does not define "adaptive functioning." Regulations promulgated by the SSA provide that "[t]he definition of [mental retardation] ... in [the] listings is consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations." *Technical Revisions to Medical Criteria for Determinations of Disability*, 67 Fed.Reg. 20018-01, at 20022 (April 24, 2002). Given "the SSA declined to adopt any one of [these] specific definitions, ... the capsule definition of Listing 12.05 can be met if the individual is found to have, *inter alia,* deficits in adaptive functioning as defined by any of the four professional organizations ." *Durden v. Astrue,* 586 F. Supp.2d 828, 834 (S.D. Tex. 2008).

must then meet the required severity level of this disorder, which is accomplished by satisfying any one of four categories labeled (A)-(D) under § 12.05. *Id.* Claimant contends that he satisfies the mental retardation listing under category C ("Listing 12.05C"), which requires (1) a valid verbal, performance or full scale IQ of 60 through 70; and (2) another impairment, physical or mental, that imposes an additional and significant work-related limitation of function.[3] *Id.* at § 12.05C.

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)(emphasis added). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment. 20 C.F.R. § 404.1525(d); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)(noting the claimant has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires him to furnish medical evidence regarding his condition). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. Medical equivalence can be found if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526(a). "Medical equivalence must be based on medical findings," and "must be supported by medically acceptable

---

[3] The "work-related limitation of function" requirement is satisfied when the claimant is determined to have a severe impairment at step two of the evaluation process. 20 C.F.R. Pt 404, Subpt. P, App. 1 § 12.00A (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)); *see also Flowers v. U.S. Dep't Health & Human Servs.,* 904 F.2d 211, 214 (4th Cir.1990) ("In this circuit, we follow the rule that if a claimant cannot return to his past relevant work, he has established a work-related limitation of function which meets the requirements of § [12.05C]"); *accord Luckey v. Dept. of Health & Human Servs.,* 890 F.2d 666, 669 (4th Cir.1989) (holding that claimant satisfies the second prong of 12.05C if claimant has *either* an additional severe impairment *or* cannot perform his past relevant work).

clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1526(b). Finally, a claimant must establish that there was a "twelve-month period...during which all of the criteria in the Listing of Impairments [were] met." *DeLorme v. Sullivan*, 924 F.2d 841, 847 (9th Cir. 1991)(finding that the claimant's back impairment did not meet the requirements of section 1.05C; remanded on other grounds).

Section 12.05 (the capsule definition to Listing 12.05C, which is involved in this case) states:

> Mental retardation refers to significantly subaverage general intellectual functioning ***with*** deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

(emphasis added)("the capsule definition").

Subsection C (Listing 12.05C), additionally requires:

> C. A valid verbal, performance, or full scale IQ of 60 through 70 ***and*** a physical or other mental impairment imposing an additional ***and significant*** work-related ***limitation of function***[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05 (2003)(emphasis added).

Under "The Revised Medical Criteria for Evaluating Medical Disorders and Traumatic Brain Injury" (hereafter, the "Revision") issued in 2001, in order to meet the criteria for the mental retardation listing, the claimant must ***first*** satisfy the capsule definition:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains a capsule definition with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment *satisfies the diagnostic description in the capsule definition **and** any one of the four sets of criteria*, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (2003) (emphasis added); *see Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). Thus, in order to prove that he satisfied Listing 12.05C, Plaintiff had to first demonstrate both "significantly subaverage general intellectual functioning" and "deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, onset of the impairment before age 22." *Id*. If the elements of that introductory definition are proven by substantial evidence in the record, only then can the claimant move forward in the Listing analysis and attempt to prove that he/she is disabled under one of the "four sets of criteria (paragraphs A through D)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (2001).

**Rejection of I.Q. scores**:

Plaintiff contends that the ALJ's rejection of the I.Q. scores derived by Dr. Ritz from his testing of Plaintiff when he was 47 years old: full scale score 68, verbal score 70, and performance score, "as not a valid indicator of his life-long abilities" is not supported by substantial evidence. Although it is not crystal clear, it appears that this rejection was made primarily to support the ALJ's findings regarding the alleged lack of evidence supporting the requirements of Listing 12.05's capsule definition, specifically the requirement that the claimant show that he suffered "significantly subaverage general intellectual functioning . . . during the developmental period . . . ." However, rejection of the I.Q. scores also impacts the issue of whether or not Plaintiff can prove that his condition meets that of mental retardation under Listing 12.05C. To satisfy that subsection of the Listing, Plaintiff must present proof of a "*valid* verbal, performance, *or* full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]"(emphasis added). Thus, by rejecting Dr. Ritz's scores as "not valid," in

addition to limiting his ability to prove that he meets the capsule definition of Listing 12.05, the ALJ

cut off any possibility for Plaintiff to meet Listing 12.05C even though the ALJ found that his seizure

disorder was a "severe impairment" at Step 2 (Tr. 13), and that it placed limitations of his abilities

to do a full range of work when he included limitations on Plaintiff's ability to have an unskilled job

where he was exposed "to unprotected heights (*i.e.*, climbing ladders, ropes and scaffolds) and

unprotected dangers (such as machinery)." (Tr. 17)[4]

Generally, the results obtained by a licensed psychologist following the administration of

accepted intelligence tests are entitled to considerable weight in Social Security cases although they

are not required to be accepted. *See Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir.1998); *Craig v.*

*Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1988);

*Foster v. Heckler*, 780 F.2d 1125, 1130 (4th Cir. 1986). The Commissioner may, however, reject

such scores if they are inconsistent with other substantial evidence in the record such as conflicting

professional opinions or other record evidence indicating that the claimant is historically higher

achieving or has more advanced functional capacities than would be expected from someone with

---

[4] With regard to Listing 12.05C, specifically, the SSA, in addressing this requirement in the Revision, equating the terms "additional and significant" with "severe":

> For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, <u>i.e.</u>, is a "severe " impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function[.]"

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00A.

a below-average I.Q. *Clark* ; *see* 20 C.F.R. § 404.1527(d)(2). Indeed, test results of this sort should be examined "to assure consistency with daily activities and behavior." *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir.1986).

In this case, there were no conflicting psychological reports or any other I.Q. scores specifically calling the validity of Dr. Ritz's scoring into doubt. Neither Dr. Ritz nor any other treating or consulting medical professional raised any doubt as to Plaintiff's efforts on the testing or as to his low intellectual function. *Compare Clay v. Barnhart*, 417 F.3d 922, 930-31 (8th Cir. 2005)(a case involving numerous different I.Q. scores and claims of malingering and/or failure to try) *and Johnson v. Barnhart*, 390 F.3d 1067, 1071 (8th Cir. 2004) (two tests; similar assertions of malingering). The evidence establishes that Plaintiff, a 49 year-old man, reads only at the second grade level and does arithmetic and spells at the third grade level. He dropped out of high school after failing at least two grades, and has not received further specialized training or a GED. The ALJ cites to the facts that Plaintiff for a period of time maintained a commercial driver's license, was a truck driver for a period of time, and that he could pay bills as support for his rejection of Dr. Ritz's test scores. The record appears to reflect that Plaintiff only paid one bill on his own, and, in order to do that, he required input from family members reminding him to pay it and telling him where to go to pay it. (Tr. 360). Why and how having a commercial driver's license and history of being a truck driver ("other record evidence") discounts the I.Q score is not explained by the ALJ.

Furthermore, regarding the second prong of the capsule definition ("deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22"), the ALJ specifically found that "there is an *absence of evidence* of adaptive limits and *no real evidence* of manifestation during the

-19-

developmental phase before age 22." (Tr. 14) (emphasis added). Further down in that same paragraph, the ALJ again writes with regard to the second prong of the Listing 12.05 capsule definition "I find *no evidence* to show that the claimant had significant limits during the developmental period . . . ." (*Id.*) (emphasis added). These specific findings of "no evidence" and "no real evidence" require a remand for development of the record and further consideration.

The record contains evidence that could support a finding that Plaintiff had adaptive limitations that were demonstrated before he turned 22. For example, both of the psychologists who submitted reports to the record agreed that Plaintiff only advanced in learning capacities (reading, spelling, arithmetic) to minimal educational levels, moreover neither of these medical professionals put forth any opinion that Plaintiff was faking low intelligence or that the I.Q. scores achieved were lower than expected based on Plaintiff's academic and vocational background. (Tr. 144-47, 192-209). Also, Plaintiff testified that he left school in the tenth grade because he "couldn't keep up with the rest," that he failed more than one grade in school before dropping out, and that he needed assistance and reminders from family members to read his mail, take his medicine, and pay minimal bills. (Tr. 360, 366-68 ). Finally, there is no evidence from any source indicating that Plaintiff's intelligence suffered or became worse after age 22 due to trauma or illness. Thus, the record is not fully developed. *See, e.g.*, *Durden v. Astrue*, 586 F. Supp. 2d 828, 838 (S.D. Tex. 2008) (identifying a claimant's inability to manage a benefit check on her own behalf as an adaptive deficit); *Maresh v. Barnhart,* 438 F.3d 897, 900 (8th Cir. 2006) (struggling in special education classes, having trouble with reading, writing and math, and dropping out of school in the ninth grade constituted evidence of mental retardation prior to age 22); *Lombard v. Barnhart,* No. 02-146-B-W, 2003 WL 22466178, at *3 (D. Me.2003) (claimant's status as a special education student and his inability to

read and write constituted sufficient evidence of onset prior to age 22, in spite of evidence that the claimant had received A's, B's and C's in school, and had held a job for at least 18 years).

It appears from his findings of "no evidence" and "no real evidence" regarding this issue that the ALJ possibly overlooked what evidence there was without making any of the required findings of lack of credibility or inconsistencies to support rejection or disregard of such evidence that he made with regard to other issues in the case. *See* SSR 96-7p (requiring an ALJ to give specific reasons for a credibility finding); *see also Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001); *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 266 (2d Cir. 1988). Independent review of the transcript of the hearing before the ALJ discloses that although he asked numerous questions of Plaintiff and his witness on other topics, the ALJ asked no questions seeking information about how Plaintiff functioned in school or otherwise before the age of 22. The full and fair development of a complete record is, in the end, the obligation of the ALJ, and where important evidence going to a vital issue in the case is missing from the record and where Plaintiff is prejudiced by the lack of such evidence, remand should be ordered to allow taking and receipt of such additional evidence. *See Shaw v. Chater,* 221 F.3d 126 (2d Cir. 2000); *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000); *Vivaritas v. Comm'r of Soc. Sec.*, 264 Fed. Appx. 155, **5 (D. N.J. 2008). Since the ALJ's findings regarding the lack of evidence supporting Listing 12.05's capsule definition are not fully explained and since there is additional evidence either supporting or refuting Plaintiff's claims of adaptive limitations before the age of 22 that was not introduced into the record, such as Plaintiff's actual school records and/or additional testimony from relatives or others about how Plaintiff actually behaved and functioned during his developmental period, *see Winston v. Barnhart*, 421 F. Supp.2d at 1360 (referencing the importance of a claimant's school records to findings

regarding the developmental period), this case should be remanded for the taking of additional evidence regarding Plaintiff's functioning, both academically and socially, during the developmental period, and to explain why he discounted the I.Q. score so the court can determine whether there is substantial evidence to support the ALJ's finding.

**Consideration of Listing 12.05C's second prong on remand:**

The ALJ did not proceed to a full analysis of the remaining requirements of Listing 12.05C, which Plaintiff claims that his combination of impairments satisfies, because he rejected Plaintiff's I.Q. scores and found that there is "no evidence" on the record about Plaintiff's adaptive limits before he turned 22. Although there are findings about the nature and extent of Plaintiff's current activities of daily living and adaptive limitations contained in the ALJ's opinion that could be said to be relevant to subsections A and D of Listing 12.05,[5] it appears that subsection C of the Listing was not considered in depth and findings were not made as to the severity of Plaintiff's seizure disorder as it applies to that subsection. The only reference to subsection C is a paragraph that does no more than state the subsection's requirements. In this regard, the ALJ stated: "In order to meet the severity of Listing 12.05C, an individual must have a valid verbal performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing an additional and significant

---

[5] The ALJ's discussion of and findings regarding what he refers to as the " 'B' criteria"and the "'C' criteria"(Tr. 14) are applicable to both subsections A and D, but not to subsection C of Listing 12.05. Listing 12.05A requires consideration of the nature and extent of a claimant's daily living activities and adaptive limitations to determine if the required level of dependency on others is shown. Listing 12.05D also requires consideration of the nature and extent of a claimant's current adaptive functioning in addition to a valid I.Q. score of 70 or lower. Listing 12.05C, on the other hand, requires only a valid I.Q. score and an additional severe mental or physical impairment that "impos[es] an additional and significant work-related limitation of function." The findings regarding "episodes of decompensation" are relevant to Listings 12.04 and 12.06, but neither of these Listings is a subject of this appeal.

work-related limitation of function." (Tr. 13). Immediately thereafter, he made his finding that Dr. Ritz's I.Q. scores should be rejected. (Tr. 14). There are no specific findings that Plaintiff's seizure disorder, which was found to be "severe" at step 2 of his analysis and which was used as a reason for placing certain limitations on Plaintiff's alleged ability to perform past relevant work in connection with the residual functional capacity analysis, is not the type of "physical or other mental impairment imposing an additional and significant work-related limitation of function"required to satisfy the second prong of subsection C. It is understandable that the ALJ did not address that second prong issue because of his rejection of the I.Q. scores and the resulting finding that the first prong of subsection C was not met. However, upon reconsideration, the second prong issue should be discussed, if applicable.

Because this case is being remanded for taking of additional evidence as to Plaintiff's adaptive functioning during the developmental period and for further consideration of Plaintiff's Listing 12.05C contentions if appropriate deference to Dr. Ritz's I.Q. scores is appropriate, the undersigned expresses no opinion as to how the ALJ should find regarding whether Plaintiff's seizure disorder is the type of additional physical or mental impairment that, along with an evidentially supportable full scale I.Q. score of 68, would satisfy subsection "C" of Listing 12.05. *See Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425 (6th Cir. 2007)(the finding of severe impairment at step 2 of the analysis does not necessarily require a finding that the same impairment satisfies Listing 12.05C). The finding of severity of work-related limitation of function, however, must be exclusive of the mental impairment finding. *See Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001) (citing *Cook v. Bowen*, 797 F.2d 687, 690-91 (8th Cir. 1986), and cases discussed

therein). That determination must be made initially by the ALJ on remand, if applicable, based on a fully developed record, including any newly submitted evidence.

Based on the above analysis, this case should be remanded for further development of the record, reconsideration of the rejection of the I.Q. score, and further consideration of Plaintiff's Listing 12.05C contention, if applicable. Since the outcome of the remand regarding Listing 12.05C will necessarily affect the remaining points raised in this case by Plaintiff and could render them irrelevant, those points are not addressed in this Report. *See Boone v. Barnhart*, 353 F.3d 203, 211n. 19 (3d Cir. 2003); *Hammon v. Sullivan*, 961 F.2d 220, *5n. 3 (10th Cir. 1992); *Garfield v. Schweiker*, 732 F.2d 605, 610-11 (7th Cir. 1984).

## VII. CONCLUSION

Accordingly, pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of Sections 205(g) and 1631 (c) (3) of the Social Security Act, 42 U.S.C. Sections 405 (g) and 1338 (c) (3), it is,

RECOMMENDED that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be **remanded** to the Commissioner for further administrative action as set out above.

Respectfully submitted,


s/Thomas E. Rogers, III
August 12, 2009              Thomas E. Rogers, III
Florence, South Carolina      United States Magistrate Judge